J-S01016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1275 MDA 2023 |

Appeal from the Order Entered October 3, 2023
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): 089-ADOPT-2022,
CP-21-DP-0000187-2017

| | | |
|---|---|---|
| IN THE INTERESTED OF: P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1278 MDA 2023 |

Appeal from the Decree Entered August 21, 2023
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 089-ADOPT-2022

BEFORE:   PANELLA, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:        **FILED: APRIL 1, 2024**

P.H. (Mother) appeals the decree entered by the Cumberland County Orphans' Court, which granted the petition filed by the local Children Youth Services Agency (the Agency) to involuntarily terminate her rights to her 5-year-old daughter, P.H. (the Child), pursuant to the Adoption Act.  **See** 23

_____

[*] Retired Senior Judge assigned to the Superior Court.

Pa.C.S.A. § 2511(a)(8), (b).[1]   Separately, Mother appeals the decision to change the permanency goal of the dependency proceedings from reunification to adoption.  **See** 42 Pa.C.S.A. § 6351(f).  After careful review, we affirm the termination decree and dismiss the goal change appeal as moot.

The history of this case depicts Mother's mental health struggles, and the juvenile court's efforts to preserve the parent-child relationship.  The Child was born in October 2017.  At that time, the Agency was already involved with the family.  The Child's older sister was the subject of ongoing dependency proceedings, due to concerns about Mother's mental health and lack of stable housing.  When the subject Child was born, the Agency received a report that Mother was presenting "as paranoid and suspicious, and failed to provide any information to the hospital staff." **See** Trial Court Opinion, 10/27/23, at 2 (citation to the record omitted).   In December 2017, the juvenile court adjudicated the Child dependent, but the court kept the Child in Mother's care.  The Child's first permanency review hearing was in May 2018, the same day that the court terminated Mother's rights to the older sister.

As to the subject Child's dependency case, Mother's service plan goals were to maintain safe and stable housing, obtain a parenting assessment, participate in any recommended services, and to obtain ongoing mental health treatment.   During much of the dependency proceedings, Mother lived in various hotels and moved frequently until she obtained a government-

---

[1] E.T. (Father) voluntarily relinquished his parental rights.

subsidized apartment which she maintained for the last two years. However, Mother's struggles with mental health continued.

In May 2018, Dr. Kasey Sheinvold stated that Mother had a paranoid personality disorder; she "has kind of a pervasive and enduring kind of mistrust of the world around [her] and a very cynical view of the world." *Id.* at 5 (citation to the record omitted). Dr. Sheinvold's concern was that Mother "is not going to be able to teach this Child to be kind of warm and open to new experience or kind of trust that the world is a safe place. So, in that long run, that can have a very negative impact on a child's ability to have healthy ideas about what a relationship is supposed to be or how to solve problems or resolve conflict because of – our parents are our earliest kind of role models for those sorts of things." *Id.*

In August 2018, Mother obtained a parenting assessment through Alternative Behavior Consultants ("ABC"), which recommended services, but in December 2018, Mother stopped participating. In January 2019, Mother did not appear at the permanency review hearing, but the court observed:

> The court is fully supportive of Mother's being able to keep [the Child] in her care. The court understands her struggles with her mental health issues, particularly her paranoid personality disorder diagnosis. The court does not want to see her make the same mistakes she made with regard to the older child by refusing to cooperate, feeling that everybody is against her. The court would have a comfort level ending dependency in this matter so long as Mother continues to cooperate with the caseworker, ABC, her attorney, and her mental health counselor. The court will not hold her failure to appear in court against her as long as she cooperates with those individuals.

*Id.* at 6 (citations to the record omitted) (style adjusted).

The dependency case proceeded this way over the next 18 months. Mother retained custody of the Child, but the case was still court-active. Mother's refusal to work with the service providers meant that the Agency and the juvenile court still had concern for the Child's wellbeing. In August 2019, the court appointed the Child a new guardian *ad litem* (GAL) in the hopes that Mother would be more trustful and cooperative. By February 2020, the court determined: "It has been painfully obvious to this court for years that Mother needs counseling to address her paranoia." *Id.* at 8.

In July 2020, in a final effort to accommodate Mother and give her a fresh start, the presiding juvenile court judge (the Honorable Edward Guido, P.J.) recused himself. Mother had accused the judge of "having a great deal of fun watching her suffering during [the sister's] termination of rights hearing," and that the judge was "humiliating" and "taunting" her; Mother accused the judge of having the "audacity" to expect Mother to appear at ongoing dependency hearings regarding the Child after the judge terminated Mother's rights to the sister. *See* T.C.O. at 3 (citations to the record omitted). The judge concluded that because of his history with Mother, her mental health status, and her perception of his motives, Mother would not make progress on her mental health while he was involved. *Id.*

The Child's dependency case was transferred to the Honorable Christylee Peck. Notwithstanding the change of judge, the court continued to accommodate Mother in the hope that Mother would eventually address her

mental health issues. The court described this period of time as one "marked by the court, GAL, counsel for all parties, the Agency, and the CASA [(court appointed special advocate)] attempting to delicately interact with Mother, merely lay eyes on the Child while in her care, and/or encourage Mother to obtain the services recommended to her for parenting and mental health without pushing Mother to retreat or cut off contact from those listed above to the extent that the court could not be certain of the Child's welfare." *Id.* (style adjusted)

After July 2020, the court excused Mother from attending the permanency review hearing; it was arranged that Mother would wait outside of the courthouse while someone else brought the Child inside to be seen by the court. Mother was distrustful of the court, but she had been relatively high functioning. So long as the Child's safety was accounted for, the court was content to let counsel represent Mother in her absence.

In October 2020, Mother contacted ABC and requested to be evaluated for parenting services. ABC told Mother that "it would be helpful" if she knew where Mother was living, "and it would show that [Mother] was committed to the process." *Id.* at 10. This triggered an angry response from Mother, who then refused to engage with ABC.

In January 2021, the court received a letter from Mother explaining why she was reluctant to participate in the proceedings, namely that the court had ignored her cooperation with the Agency and her prior efforts to reunify with the Child's sibling. The court also admitted a psychiatric evaluation of Mother,

which indicated: that Mother was having difficulty getting through the day due to rituals consistent with obsessive compulsive disorder; that Mother expressed fears of driving and using public restrooms; and that she experienced hallucinations.

Over the next several months, Mother continued to resist court oversight, but she had started taking her medication again and her mental health improved. In August 2021, the court heard from the GAL that the Child – then nearly 4 years old – appeared happy and healthy, and Mother was on a waiting list for housing.

But in October 2021, the GAL reported that Mother was backsliding. The cause was Mother's frustration with the caseworker – specifically, about the Agency's resistance to arranging visits between the maternal grandparents and the Child. The GAL tried to assure Mother that the caseworker was trying to make a genuine effort with Mother, and that Mother had made significant strides. Mother responded by writing the GAL a hostile letter, at the end of which Mother said:

> I will never set foot in that courtroom, so don't hold your breath. If that judge is waiting for me to participate in person before she'll end dependency, then I need to move to another state that will be more reasonable and realize there is not even a case here.

*Id.* at 14 (citations to the record omitted).

The juvenile court ordered Mother to appear at the next court hearing in person and to allow visits between the GAL and the Child. The court further

- 6 -

ordered the Agency to set up visits between the Child and the maternal grandparents, obtain a therapist for the Child, and enroll the Child in the Head Start program. Mother did not come to the ensuing hearing. Mother sent a letter asking the court to excuse her appearance, in part, because she had appeared before the magistrate the day prior (regarding an altercation with her neighbor) and she was still recovering from the experience. The court, frustrated with Mother's apparent ability to attend other court proceedings, ordered her to come to the next permanency review hearing.

At that January 2022 permanency hearing, the presiding judge met Mother for the first time. Mother had yet to complete mental health or enroll the Child in Head Start. Mother went to the parenting assessment, but evidently told the service provider that it was too late for the Agency to provide services and that she did not want to participate. *Id.* at 15-16.

Mother's limited participation in her mental health and parenting goal finally came to a head in February 2022. The juvenile court had learned: Mother did not attend any medication management appointments with her psychiatrist since October 2021; she was discharged from outpatient counseling in December 2021; she deleted her email and would not answer phones calls; she had rescheduled the Child's March 2022 cardiology appointment against medical advice; she was not answering her attorney's attempts to contact her; and the Child was not enrolled in Head Start. On February 18, 2022, the juvenile court gave the Agency approval to remove the Child and place her in foster care.

The juvenile court held a permanency review hearing in March 2022. Mother had restarted mental health services, though she was not yet scheduled to see the psychiatrist. The court explained to Mother that she needed to receive a psychiatric evaluation, whereupon Mother said "that is not happening" and stormed out of the courtroom. *Id.* at 17. The court further ordered Mother to obtain a parenting assessment at ABC and continue with medication management. In May 2022, the Agency requested that the juvenile court make a finding of "aggravated circumstances" on the basis that Mother's rights had been previously terminated as to the Child's sister. *See* 42 Pa.C.S.A. § 6302 (defining "aggravating circumstances" as a circumstance where: "(5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent."). The court eventually found aggravated circumstances but did not relieve the Agency of its obligation to make efforts toward reunification.[2]

From March 2022 until October 2022, Mother had twice-weekly visits with the Child at ABC. Mother requested a different ABC employee supervise the visits. Mother was accommodated, but the change meant that the visits had to decrease to once per week, due to scheduling availability.

_____

[2] The Juvenile Act provides, if the child is dependent, and the court determines that aggravated circumstances exist, then "the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made…." *See* 42 PA.C.S.A. § 6341(c.1)

At the January 2023 review hearing, the court learned that Mother had again stopped her mental health treatment for approximately three months but that she had re-entered treatment. The court also learned that Mother blocked the Agency's phone calls and did not respond to the parenting evaluation sent to her by mail. However, Mother indicated to her attorney that she would work on the parenting recommendations.

Mother had obtained a parenting assessment from ABC in September 2022, which recommended an intensive program of no less than six months. Parenting services with ABC did not begin until February 2023. The immediate goal was to prepare for home sessions and set expectations, which necessitated Mother completing assignments, or "homework." Mother did not complete the assignments; still, ABC informed Mother at the end of the fifth session that the Child would be coming to Mother's home for a visit the following week. This caused Mother to become agitated. Mother sent a series of emails, which included her list of conditions, which ABC would not accommodate. Mother then told ABC that she did not want to work with them anymore and that she wanted to have visits at the Agency's office.

In May 2023, the Agency petitioned to terminate Mother's rights and change the permanency goal from reunification to adoption. Shortly thereafter, Mother alleged that the Child told her that the foster father touched "her private area," and that the Child described the foster father's private parts. Following the report, the foster father voluntarily moved out of the

home for three weeks, so that the Agency did not have to remove the Child pending the investigation. The report was eventually deemed unfounded.

In June 2023, Mother sent an email to the foster mother (and others, including Mother's attorney and Agency caseworker) wherein she called foster father a child molester and a pedophile; Mother also called the foster parents "murderers on top of pedophiles;" alluding to the death of foster parents' son, who, in 2021, passed away due to complications from COVID-19 and a pre-existing brain defect. *Id.* at 22.

In July 2023, the foster parents withdrew from fostering the Child, because they feared for their safety; they had reported seeing a vehicle outside of their home that looked like Mother's. However, visits still occurred between the Child and the foster family, and ultimately the foster family said that they wanted the Child to be part of their family forever. For her part, the Child competently testified that she wanted to be adopted by the foster family, although she enjoyed spending time with Mother, who she refers to by her first name.[3]

The court presided over the consolidated goal change and termination hearing on August 16, and 18, 2023. The court determined that the causes of the Child's placement – namely, Mother's untreated mental health issues –

---

[3] Following her removal in February 2022, the Child had initially been placed in a different foster home. She has resided with her current foster home since January 2023. We further note that, at the termination hearing, the Child was appointed separate counsel under 23 Pa.C.S.A. 2313(a), notwithstanding the fact the Child's best interests and legal interests did not conflict.

still existed. The court subsequently terminated Mother's rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), (b); and the court changed the permanency goal to adoption. Mother timely filed this appeal, wherein she presents the following five issues, which we have reordered for ease of disposition:

1. Whether the trial court erred as a matter of law and abused its discretion when it found that Mother's parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(8) as the Agency did not provide sufficient evidence at the hearing on the Agency's petition for termination of Mother's parental rights to establish that the conditions which led to the removal of the child from Mother's care and placement of the child in foster care continue to exist and termination of parental rights would best serve the needs and welfare of the child?

2. Whether the trial court erred as a matter of law and abused its discretion when it found that the Child's permanency goal of reunification was neither appropriate not feasible, and ordered a goal change to adoption, thus contravening 42 Pa.C.S.A.§ 6351(f)?

3. Whether the trial court erred as a matter of law and abused its discretion in changing the goal from reunification to adoption when the conditions which led to removal/placement of the child no longer existed or were substantially eliminated, thus contravening 42 Pa.C.S.A.§ 6351(f)?

4. Whether the trial court erred as a matter of law and abused its discretion determining the best interests of the child would be served by changing the goal to adoption when Appellant had met or was meeting all her permanency plan goals, and was ready, willing, and able to parent the child and provide for her needs, thus contravening 42 Pa.C.S.A.§ 6351(f)?

5. Whether the trial court erred as a matter of law and abused its discretion in determining that there was minimal compliance with the permanency plan and that there were continued concerns about Mother's mental health when the only mental health professional who

- 11 -

> testified at the hearing provided testimony that Mother was progressing with her mental health treatment?

Mother's Brief at 5-6 (style adjusted).

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court.").

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of Adoption Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

***In re C.M.K.***, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted).

We need only agree with the lower court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the court's decree. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*); ***see also C.S.***, 761 A.2d at 1201. Instantly, the court terminated Mother's rights under 23 Pa.C.S.A. § 2511(a)(8) and (b). Those subsections provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary

agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

[…]

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In her first appellate issue, Mother argues the orphans' erred when it determined that the Agency provided sufficient evidence to establish termination under Section 2511(a)(8). This subsection contains three elements, which we discuss in turn.

First, Section 2511(a)(8) sets forth a twelve-month timeframe for a parent to remedy the conditions that led to the child's removal by the court. *See In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Instantly, Mother does not dispute that the first element of the analysis has been met. The orphans' court terminated Mother's rights approximately 18 months after the Child was removed in February 2022.

Second, once the court establishes the twelve-month timeframe, the court must next determine whether the conditions that led to the child's removal continue to exist. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied. *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination pursuant to Section 2511(a)(8) does not include an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (quoting *I.J.*, 972 A.2d at 11-12).

On this point, Mother argues that the reasons given for the Child's removal no longer existed at the time of the termination hearing. Mother maintains that she achieved stable housing and that she consistently attended and participated in the recommended mental health treatment. *See generally* Mother's Brief at 37-40.

- 15 -

While housing was an objective during the dependency case, we note that Mother maintained an apartment for two years.[4]  The court determined that, to the extent that Mother's housing was a cause for the Child's removal, this condition had been remedied.  *See* T.C.O., *infra*.  But there could be no question that the primary cause of the Child's removal was Mother's untreated mental health issues and the impact those issues had on Mother's ability to parent.

In a thorough Rule 1925(a) opinion, Judge Peck detailed extensively the basis for concluding that this condition – Mother's untreated mental health issues – led to the Child's removal and continued to exist at the time of the termination proceeding:

> The Child was removed from Mother's care after four years of dependency, in February 2022, when Mother went off the radar, deleted her e-mail, no one could get in contact with her, and the court learned she had not been to a medication management appointment or to counseling in months, all of which was on the heels of threatening to leave the Commonwealth and other erratic behavior, including sending disparaging e-mails to the GAL and caseworker in response to the GAL attempting to encourage and support Mother.  Mother was not engaged in parenting services, and she was not engaged with mental health services at all at that time.  These circumstances prompting removal of the Child from Mother's care did not, however, occur in a vacuum.  At every turn, this court gave Mother more leeway in declining to participate in court proceedings or the family service plan goals than the court had ever given a parent in a dependency action.  *Mother did not appear in court for*

---

[4] It should be noted, however, that the appropriateness of the home was questioned.  Mother had covered the windows with blankets or towels, and she was living out of boxes.

*three years* and only intermittently brought the child to be seen by the court via third-party-transport until the court specifically ordered Mother to appear given that she was appearing for other, unrelated court proceedings and was evidently simply choosing not to come to court where the court was attempting to ensure the best interests of her Child.

For the year-and-a-half when Mother was not appearing for proceedings before Judge Guido, he was persistently issuing orders expressly telling Mother *he did not want to take the Child from her care*, and indicating more than once that he was considering terminating dependency if she would cooperate with the Agency, her counsel, and her mental health counselor. She did not, and instead maintained that Judge Guido felt nothing but joy at humiliating and taunting her. Judge Guido replaced the GAL, removed the CASA, and finally recused himself, all in an effort to give Mother a fresh start and encourage her to feel comfortable in engaging in services and meeting her service plan goals.

Thereafter, Mother would engage with service providers or the GAL or the court, briefly, until she perceived someone to be "against her" or, frankly, when someone told her something she did not want to hear. In other respects, she would make just enough of an effort to begin to meet a service plan goal to avoid removal of the Child but, in the same review period, would cut off the GAL from seeing the Child or block communications from the Agency. She went to ABC in October 2020 to obtain a parenting assessment, but when Ms. Sweger asked for her address, Mother accused her of trying to take her child and she terminated the session. She sent bizarre messages to the GAL and caseworker, saying the court should not hold our breath for her to appear in court. In January 2022, the court accommodated her request to avoid ABC for parenting services and use a provider of her choice, but she ultimately declined participation upon her first meeting with that provider. Mother obtained a parenting assessment from ABC at the end of 2022, but shortly thereafter voluntarily decreased her visit time with the Child because of perceived slights by the visit-supervisor, who was "too pushy." The court appointed Mother different counsel because of perceived conflicts Mother had with her first attorney, with whom she was refusing communication. The court noted

that past counsel was conveying to Mother that this court said it needed her to attend court hearings for us to meet her and discuss what was needed of her. This court needed to make sure Mother could function in a public setting. Mother began parenting services again, finally, in February 2023, but ceased working with ABC at all after five sessions, again due to perceived slights or mistreatment from the provider, and after sending ABC a list of conditions under which she would agree to work with them. In the meantime, Mother called in a ChildLine report that the Child was being sexually abused in her foster placement and sent a letter to the foster parents calling them pedophiles and murderers.

The court recognizes that Mother was in a partial hospitalization program at the time of the termination and had been in same since January of this year. The issue remains that Mother's erratic behavior and unwillingness to work with others, obviously due to her mental health conditions, continued during that period and for months after she had been immersed in the program, and at times increased in severity. She was in the mental health program when she refused parenting services, unless ABC was willing to provide services with exactly the person she wanted, when she wanted, and how she wanted. She was also in treatment when she reported the foster family for sexually abusing the Child when, by all accounts and following investigation, the accusation was untrue, and then suggested they murdered their own son who had passed away tragically. The court must note, finally, that it was not encouraged by the testimony of the director of Mother's mental health program. Merakey[, the service provider,] did not have a release from Mother to exchange information with the Agency until just two months prior to the termination hearing (*and after the termination petition had been filed*), and Ms. Mobray's view of Mother's messages to the foster family, namely finding the e-mails comparable with people who "rant[] on Facebook," indicates to us that the providers at the program are not aware of the seriousness of Mother's history or the history of this case.

The court echoes the concerns of Ms. Sweger that Mother has not been able to handle or appropriately interact with other people under circumstances where each person associated with this case has consistently attempted to delicately interact with Mother, always careful not to push

too hard or too far or say anything that might cause Mother to drop off the radar once again or cut off contact with the Child. If Mother would fully commit to the parenting program, for example, such tiptoeing would not occur, and she would be [] able to participate and engage and hear instruction and prompting she has, never to date, been able to hear without storming out, quitting the program, or cutting off contact. It was not our hope that this case would turn out the way it did. For nearly six years the court waited, tiptoed, and deferred to Mother's comfort level in engaging in services and in the court proceedings. We are six years into this case and Mother has yet to meaningfully engage, let alone complete, the parenting services recommended to her, in part [] due to concern for Mother's paranoia resulting in Mother's inability to care for the Child's emotional needs.

*\*\**

From our long involvement with this case, it is apparent that Mother's mental health conditions, although at times more treated and at other times not, continue, to her and the Child's detriment, just as they did from the start. The court recognizes that Mother attained stable housing and at least has received some services for her mental health. Sadly, it appears the most Mother is able to do is the above, which may provide shelter for her and keep her from harming herself and keep her partially functioning in society. She cannot, or has not, progressed in her mental health to such a level that the court can say it is safe for the Child's well-being to be in her care.

T.C.O. at 26-31 (emphasis original) (style adjusted) (citations to the record omitted).

These findings are supported by the record, and thus we conclude the orphans' court did not err or abuse its discretion when it concluded that the conditions, which led to the Child's placement, continued to exist at the time of termination.

The third and final element of the Section 2511(a)(8) analysis requires the court to assess whether the termination would best serve the needs and welfare of the Child. Although technically distinct, we have held that the "needs and welfare" element under Section 2511(a)(8) dovetails with the analysis required by Section 2511(b); both require consideration of "intangibles such as love, comfort, security, and stability" and both require the court to discern the nature and status of the parent-child bond. *See I.J.*, 972 A.2d at 12 (citing *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) and *In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*)). Still, the focus of the "needs and welfare" analysis vis-à-vis Section 2511(a)(8) remains on the parent. *See C.M.K.*, 203 A.3d at 261-62.

On this point, Mother's primary argument is that the court erred, because there was no evidence that Mother's personality disorder would inflict substantial physical or mental harm on the Child. *See* Mother's Brief at 39. In its Rule 1925(a) opinion, the orphans' court addressed the Child's needs and welfare under Section 2511(a)(8) contemporaneously with its analysis under Section 2511(b). Mother does not challenge the court's determination under Section 2511(b), nor does she take issue with the court's consolidated analysis.

In its Rule 1925(a) opinion, the court explained why termination would best serve the Child's needs and welfare – specifically, how Mother's untreated mental health concerns adversely affected the Child:

> The Child was about to begin kindergarten at the time of the termination and goal change hearings. She is currently diagnosed with "disruptive, impulsive-control and conduct disorder," is under consideration for an anxiety disorder diagnosis, and is enrolled in play therapy.
>
> […]
>
> When the Child competently testified in May 2023 for purposes of the termination and goal-change petitions, she understood the nature of adoption and she said she enjoys living with her foster family and she wishes to be adopted by them, though she reported she enjoys visiting with her mother, whom she called by Mother's first name. The Child visits with her biological sister about once a month and enjoys those visits; her foster family has developed a positive relationship with the Child's sister's adoptive family. The Child's case manager, Addie Bitzer, said that the Child has fit in very well in her foster family, and very much enjoys having a big sister and a little sister in the foster family. Ms. Bitzer said the Child has a strong emotional connection with her foster parents, goes to them for comfort and love, needs constant reassurance from them that they love her and are going to be there for her, and calls them "mommy" and "daddy." Each time this court has met with the Child, she has appeared to us to be markedly more intelligent, observant, and vocal about her thoughts and desires than is typical of her age.

T.C.O. 23, 24-25 (citations to the record omitted) (style adjusted).

The orphans' court explained further:

> The Child had been out of Mother's care for over a year and a half at the time of the termination hearing. She had been with her foster family for eight months, with brief interruption by Mother's attempt to sabotage the placement. The Child's counsel said at the hearing that the Child reports to her that she wants to be adopted by her foster family and that she did not want to live with her Mother anymore. Counsel said she believes the Child to be tired of court involvement and of all the case participants having been part of her life since birth. The Child's foster mother, opining on behaviors following visits with Mother, said that

the Child sometimes "will say that she doesn't have a family, but that she wants a family." This is difficult evidence to hear, as our delay to not make this decision sooner out of the hope of Mother's improvement (*i.e.* ordering reasonable efforts to continue) has caused suffering to the Child.

The court is cognizant that Mother loves the Child, and that Mother kept the Child physically well. The court notes, however, that Mother's paranoia of and pushing against the assistance of those around her have several times been demonstratively adverse to the Child's best interests. In addition to attempting to disrupt the Child's stability in her foster home via the ChildLine report and accusatory letter to the foster family, Mother refused to open the door when the Agency appeared to remove the Child from her custody in February 2022; a deputy with the Cumberland County Sheriff's Office had to intervene and even then, Mother refused to send the Child with any coat or shoes in the middle of winter, which resulted in the deputy giving the Child his jacket. The removal of the Child from the home could have been made less traumatic with Mother's attention to the Child's best interests in the moment.

The court is convinced that the Child's best interests do not lie in waiting for Mother to show stability in mental health and commitment to parenting the Child safely and in attending to the Child's emotional needs and welfare, or demonstrate willingness to hear and work with those who have persistently and delicately attempted to keep the Child with Mother. As the court noted herein, the court did not wish for the case to go this way. The court is sympathetic to Mother's feelings that the court made up its mind a long time ago to take her child from her. The court doesn't doubt that Mother actually believes that. Such is of course not the case, as the court tediously laid out our efforts herein, and the court laments that Mother's distrust of those trying to help her continues. Over the life of this case, one significant concern for the Child being in Mother's care is that this very special Child will [] distrust the world around her as was the case with Child's older sister. The court notes, for example, that there was testimony that the Child reported while in foster care that her Mother closed all the blinds to the windows in their house and that she was not allowed to look out the windows. The Child, meanwhile, desperately needs permanency and has for a long time. She knows more about

the circumstances of her placement than a child her age should, and she very much deserves to know now where she will remain.

*Id.* at 32-34 (citations to the record omitted) (style adjusted).

Taken together, we conclude that these findings constitute a sufficient basis for the court to find that termination would best serve the Child's needs and welfare under Section 2511(a)(8). And upon our review, we conclude that the evidentiary record supports these findings. In reaching this decision, we reiterate that this Court is not in a position to make close calls. ***See also S.K.L.R.***, 265 A.3d at 1124. It is not our rule to scour the record for contrary conclusions or to substitute our judgment for that of the lower court, whose understanding of the case and the parties appearing before it is "longitudinal." ***See id.; In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). For these reasons, we conclude that that the orphans' court did not err when it determined that the Agency proved, by clear and convincing evidence, that termination was warranted under Section 2511(a)(8). Mother's first issue merits no relief.

Mother's remaining issues pertain to the lower court's decision to change the permanency goal from reunification to adoption. This Court has held that a termination of parental rights decree, once affirmed, renders moot any challenge to the dependency court's decision to change the goal of the permanency review hearing. ***See D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) (holding that an issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect) (citing ***In re D.A.***, 801 A.2d 614, 616 (Pa. Super. 2002)) ***see also In re Adoption of***

***A.H.***, 247 A.3d 439, 446 (Pa. Super. 2021) (holding that a decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change a child's goal to adoption). Therefore, we do not address Mother's appeal from the goal change order.[5]

Decree affirmed. Appeal from goal change order dismissed as moot. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2024

---

[5] Although we do not address the goal change decision, we note that the court did not relieve the Agency of its obligation to provide reunification services, notwithstanding the finding of aggravating circumstances. We commend this decision.